**[61,62,63]**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| PLATINUM LINKS ENTERTAINMENT, | : | Civil Action No. 02-4106 (FLW) |
| CARLOS NESBITT and KARL THOMAS | : | |
| Plaintiffs, | : | |
| v. | : | **OPINION** |
|  | : | |
| ATLANTIC CITY SURF PROFESSIONAL | : | |
| BASEBALL CLUB, INC., MICHAEL | : | |
| ERSKINE, WILLIAM GLASS, ARTHUR | : | |
| SNELLBAKER, BENJAMIN | : | |
| FITZGERALD, and THE CITY OF | : | |
| ATLANTIC CITY, | : | |
| Defendants – Third Party | : | |
| Plaintiffs | : | |
| v. | : | |
|  | : | |
| JERSEY SHORE PROFESSIONAL | : | |
| BASEBALL, LLC, and MARIO F. | : | |
| PERRUCCI and JEFFREY RODMAN | : | |
|  | : | |
| Third-Party Defendants. | : | |

## WOLFSON, District Judge

Presently before the Court are three separate motions for Summary Judgment relating to the Complaint of Platinum Links Entertainment ("Platinum Links"), Carlos Nesbitt and Karl Thomas ( collectively known as "Plaintiffs") and the Third Party Complaint of Atlantic City Professional Baseball Club, Inc. ("AC Pro Ball Club").   Plaintiffs seek to recover damages for alleged contractual breaches and constitutional violations arising out of events surrounding a rap and hip hop concert that occurred on August 25, 2002 at Sandcastle Stadium in Atlantic City,

1

New Jersey.  Plaintiffs filed suit against Atlantic City Surf Professional Baseball Club, Inc., the City of Atlantic City, Deputy Chief of Police Michael Erskine, Deputy Chief of Police William Glass[1], Chief of Police Arthur Snellbaker, and Business Administrator Benjamin Fitzgerald (collectively known as "City Defendants").  On October 18, 2002, AC Pro Ball Club filed a Third Party Complaint against Jeffrey Rodman and Mario Perrucci, the principals of Jersey Shore Professional Baseball, LLC ("Jersey Shore Baseball") seeking contribution and indemnification for any judgment against them.

Following the conclusion of discovery, dispositive motions were filed: on November 9, 2005, AC Pro Ball Club moved for summary judgment on Plaintiff's Complaint; on November 15, 2005, the City Defendants moved for summary judgment on Plaintiff's Complaint; and on November 15, 2005, Mario Perrucci moved for summary judgment on AC Pro Ball Club's Third Party Complaint.  The Court has considered the moving, opposition and reply papers, and for the reasons set forth below, AC Pro Ball Club's Motion for Summary Judgment will be denied without prejudice, the individual City Defendants' Motion for Summary Judgment on the issue of qualified immunity will be granted; the City Defendants' Motion for Summary Judgment will be denied in part and granted in part, and Mario Perrucci's Motion will be denied in part and granted in part.

**I. Background**

This matter arises out of events surrounding a rap and hip hop concert that was held on

---

[1]The Court notes that William Glass is represented by separate counsel and has not yet filed any motions in the instant matter.

August 25, 2002, at Sandcastle Stadium in Atlantic City, New Jersey.  Sandcastle Stadium, home

of the Atlantic City Surf ("Surf"), a professional minor league baseball team, is owned by the

City of Atlantic City and leased to the Casino Reinvestment Development Authority ("CRDA").

In turn, the CRDA subleases the facility to the owners of the Surf.[2]   In 2002, the Surf was owned

by Francis F. Boulton III and Anton H. Rosenthal.

On May 3, 2002, the Surf owners, Boulton and Rosenthal, entered into a Management

Agreement ("Agreement") with Jeffrey Rodman and Mario Perrucci for the operation and

management of the AC Pro Ball Club for the 2002 baseball season through December 31, 2002.

See Pl's. Opposition ("Opp.") to AC Pro Ball Club's Summary Judgment Motion ("SJ Mot."),

Braverman Cert., Ex. D at 2.  AC Pro Ball Club is referred to as the "Company" in the

Agreement, but it is not a defined term.  Pursuant to the Agreement, Rodman and Perrucci

operated and managed the Surf and utilized the Stadium for other, non-baseball related events.

Moreover, under the terms of the Agreement, Rodman and Perrucci assumed all liabilities for the

AC Pro Ball Club through December 31, 2002.  The Agreement provided in relevant part:

"[o]perator is asuming [sic] the management of the Company as is. . .all liabilities of the

Company as of the date of Closing are assumed by Operator. Operator further specifically

assumes all liabilities in conjunction with all open contracts of the Company. As of the date of

Closing, Operator shall be solely responsible for all liabilities associated with the Company and

---

[2]As discussed infra, the Court notes that there are significant questions of fact concerning
the corporate entities in the instant dispute.  Specifically, it is entirely unclear whether the
Atlantic City Surf is the same entity as the Atlantic City Surf Professional Baseball Club, Inc.
Moreover, the facts are unclear as to whether the Atlantic City Surf Professional Baseball Club,
Inc. is the same entity as the Atlantic City Professional Baseball Club, Inc.

the assets thereof for the 2002 Championship Season and through December 31, 2002." Id. at 11-12.  Additionally, the Agreement provided that any and all notices for Boulton or Rosenthal were to be delivered to each owner's out of state home address.  However, any notices for Perrucci and Rodman were to be delivered "c/o Atlantic City Professional Baseball Club, Inc., 545 North Albany Ave, Atlantic City, NJ." Id. at 13.  Moreover, at some point, Rodman and Perrucci formed an entity known as Jersey Shore Professional Baseball LLC ("Jersey Shore Baseball") for the alleged purpose of managing and operating the AC Surf.[3]  Perrucci's Statement of Facts, Perrucci Br. at 3 ¶ 4.

On or about July 30, 2002, Platinum Links and AC Surf agreed to enter into a contract for the staging of a hip hop and rap concert to be performed at Sandcastle Stadium on August 25, 2002.  Pl's. Opposition ("Opp.") to AC Pro Ball Club's Summary Judgment Motion ("SJ Mot."), Braverman Cert., Ex. B.  The contract was signed and dated, August 9, 2002.  Carlos Nesbitt signed the contract on behalf of Platinum Links and Rodman signed the contract as a Representative of "Atlantic City Surf".  The contract was drafted on letterhead which bore both the name and logo of the Atlantic City Surf Professional Baseball Club ("ACSPBCI"); moreover, the letterhead featured an address for the ASPBCI  that was the same address as that listed for Perrucci and Rodman in the Management Agreement.  In other words, the address for the Atlantic City Surf Professional Baseball Club as set forth in the contract between AC Surf and Platinum Links was the same address as that of the Atlantic City Professional Baseball Club as

_____

[3]The Court notes that Perrucci has not provided a corporate charter or any document that would establish when Jersey Shore Professional Baseball was established or in what capacity. Perrucci relies solely on his own deposition at which he testified that Jersey Shore Professional Baseball operated the Atlantic City Surf after May 3rd, 2002.  See Perrucci's Br. for SJ, Koch Cert., Ex. A., 3:4-4:10.

set forth in the Management Agreement.

The contract between Platinum Links and AC Surf set forth the responsibilities of both parties regarding the August 25, 2002 concert.  Specifically, the contract provided that Platinum Links was responsible for the security of the event including paying for and providing security by a "team approved concert security company."  In addition, the contract provided that "[f]acility security shall be agreed upon (by AC Surf, Your organization [Platinum Links] & police) number of off duty AC Police Officers & shall include officers conducting traffic control on Albany Ave."  Pls. Opp. to AC Pro Ball Club's SJ Mot., Braverman Cert., Ex. B at 1.  Finally, Platinum Links was responsible for obtaining any and all permits needed or associated with the concert. Id. at 2.

According to witness testimony, in the weeks prior to the concert the Atlantic City Police Department ("ACPD") became increasingly concerned about safety at the concert.  Erskine Dep. 12:20-14:18.  Specifically, the ACPD became aware of an increased potential for gang-related violence based on violent incidents that occurred at previous concerts by some of the same performers scheduled to perform at the August 25th concert.  Id. at 14:11-18, 17:8-24.  In light of this information, on August 16, 2002, Deputy ACPD Chiefs Michael Erskine and William Glass met with Perrucci and Rodman to relate the police department's concerns about the upcoming show and to recommend that the concert be cancelled.  Erskine Dep. 59-61; Rodman Dep. 68-70. As of that date, slightly more than one week before the concert, Plaintiffs had not put forth a security plan related to the upcoming concert nor had Plaintiffs met with a security provider regarding this concert.  Nesbitt Dep. 57:16-58:5.   Thereafter, on August 19, 2002, representatives of the ACPD participated in a conference call in which they informed Rodman,

5

Perrucci and others of their concerns about violence at the concert.  Erskine Dep. 76:17-24;
Rodman Dep.  On that same date, August 19, 2002, Rodman and Perrucci notified Plaintiffs that
the concert was cancelled.  Rodman Dep. 109-111.

On August 22, 2002, Plaintiffs filed a Complaint and  made an application for a
temporary restraining order ("TRO") and a preliminary injunction in the United States District
Court of New Jersey.  On the following day, the Honorable Joseph E. Irenas, U.S.D.J., held a
hearing on the TRO.  However, Judge Irenas did not rule on the application; instead, the parties
reached a compromise agreement that the concert could go forward pending the inclusion of
certain security measures, and, on August 25, 2002, the concert was held, as scheduled, at
Sandcastle Stadium.

On September 30, 2002, Plaintiffs filed an amended complaint alleging that Defendants'
actions in initially cancelling the concert violated their First, Fourth and Fourteenth Amendment
rights.  In addition, Plaintiffs allege that they suffered substantial financial harm as a result of the
announced cancellation because many fewer people came to the concert than originally expected.

Thereafter, on October 18, 2002, AC Pro Ball Club filed a Third Party Complaint against
Jeffrey Rodman and Mario Perrucci.  Following the completion of discovery, in November 2005,
AC Pro Ball Club and City Defendants separately moved for summary judgment on Plaintiff's
Complaint. At or around the same time, Mario Perrucci moved for summary judgment on AC
Pro Ball Club's Third Party Complaint.  The Court will analyze each individual motion in turn.

## II. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A genuine issue of material fact is one that will

permit a reasonable jury to return a verdict for the nonmoving party.  Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986).  To show that a genuine issue of material fact exists, the

nonmoving party may not rest upon mere allegations, but must present actual evidence in support

thereof.  Id. at 249 (citing First Nat'l Bank of Arizona v. Cities Svc. Co., 391 U.S. 253, 290

(1968).  In evaluating the evidence, the Court must view evidence and draw inferences "in the

light most favorable to the party opposing the motion." Waldorf v. Shuta, 896 F.2d 723, 728 (3d

Cir. 1990) (quoting Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)).


### III. Discussion

### 1. Atlantic City Professional Baseball Club Inc.'s Motion for Summary Judgment.

Initially, Defendant, AC Pro Ball Club, contends that it is not a proper party in this suit

and thus, the Complaint against it should be dismissed as a matter of law.  Specifically, AC Pro

Ball Club argues that the contract for the concert manifested an agreement between Platinum

Links and Rodman as a representative of the AC Surf and not as a representative of AC Pro Ball

Club.  Moreover, Defendant alleges that Rodman was not an employee of AC Pro Ball Club and

was not authorized to enter into a contract on its behalf.  Finally, Defendant contends that

Rodman was acting on behalf of Jersey Shore Baseball, and not AC Pro Ball Club or AC Surf,

when he entered into the contract with Plaintiffs.  According to AC Pro Ball Club, the facts in

this regard are clear and undisputed.  The Court does not agree.

To begin, the Court notes that there are numerous and significant issues of fact

concerning the identity of the various corporate entities involved in this suit.  Indeed, the few documents relied upon by the parties identify no less than four separate names for what appear to be no more than two separate entities – the entity that owns the ball club and the entity that operates the ball club.  Specifically, the non-municipal Defendants have represented themselves as the Atlantic City Surf, Atlantic City Surf Professional Baseball Club, Inc., the Atlantic City Professional Baseball Club, Inc., and Jersey Shore Professional Baseball, LLC.  Despite these multiple names, however, the parties have not provided a single document, such as a corporate charter, that could help to establish the proper corporate entity involved in this suit[4].

Moreover, the Court finds AC Pro Ball Club's argument that the record is clear on the parties' proper corporate affiliation strains credulity.  For example, the Court notes that the Management Agreement between Rodman, Perrucci, Boulton and Rosenthal is signed by these four individuals as individuals and not in the names of any corporate entities.  Indeed, the only corporate entity mentioned in the Agreement is the subject of the Agreement itself – i.e. the entity identified as the Atlantic City Professional Baseball Club, Inc.  Jersey Shore Professional Baseball is not named, referenced or mentioned at all in the Management Agreement.  Similarly, the contract between Platinum Links and AC Surf was signed by Rodman as a representative of AC Surf and the letterhead was that of the Atlantic City Surf Professional Baseball Club.  Thus, the Court finds that AC Pro Ball Club's suggestion that the "motion record is sufficiently clear that Jeffrey Rodman was acting on behalf of Jersey Shore Professional Baseball, LLC, when he entered into the contract with plaintiffs" is wishful thinking.  AC Pro Ball Club Br. at 3.

---

[4]Indeed, the Court is surprised at the lack of depth in addressing facts and issues with supporting documents in the context of a motion for summary judgment.

Despite the significant factual issues about the identities of the corporate entities in this suit, the Court finds that certain facts are undisputed. First, it is clear from the record Platinum Links did not have a contract with either Boulton or Rosenthal individually; instead, Platinum Links contracted with AC Surf through its representative Jeffrey Rodman. Moreover, there is no evidence that Rodman was employed by Boulton or Rosenthal. Instead, as per the Management Agreement which was captioned "Management Agreement By and Between Francis F. Boulton, III and Anton H. Rosenthal and Mario F. Perrucci and Jeffrey Rodman," Perrucci and Rodman were responsible for the management of the AC Pro Ball Club. The issue here is which corporate entities are, in fact, separate corporate entities and which entity is a proper defendant. However, because there are significant issues of fact regarding the proper corporate entity, the Court must deny AC Pro Ball Club's Motion for Summary Judgment.

AC Pro Ball Club alternatively contends that even if it is a proper defendant in the instant matter, summary judgment is still appropriate because the actions of the ACPD rendered the performance of the contract with Platinum Links impracticable. Specifically, AC Pro Ball Club alleges that it cannot be held liable under the contract because the concert was "ultimately cancelled based upon the information provided by and actions of the Atlantic City Police Department." AC Pro Ball Club Br. at 3. The Court does not agree.

According to the Restatement (Second) of Contracts, "where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary." Restatement (Second) of Contracts § 261 (1977); see also M.J. Paquet Inc., v. New

9

<u>Jersey Department of Transportation</u>, 171 N.J. 378, 391 (2003).  In other words, an essential part of the doctrine of impracticability is that a party to a contract be unable to perform its duties pursuant to the contract.  Common sense dictates that if the contracted-for-performance actually occurs, the doctrine of impracticability cannot apply.  In the instant matter, despite the initial cancellation of the concert, Plaintiffs filed for emergent relief in this Court, and, after a hearing held before Judge Irenas on August 22, 2002, the parties reached an agreement enabling the concert to go  forward as planned on August 25, 2002.  Thus, the Court finds that the doctrine of impracticability is inapplicable here.

Moreover, the Court finds that AC Pro Ball Club's reliance on Section 264 of the Restatement (Second) of Contracts is similarly misplaced.  Section 264 provides that if the performance of a duty is made impossible through a governmental regulation or order, that regulation or order is an event "the non-occurrence of which was a basic assumption on which the contract was made."  <u>Id.</u> at § 264.  The Comments to Section 264 further provide that "[u]nder the rule stated in this Section, the regulation or order may be domestic or foreign. It may emanate from any level of government and may be, for example, a municipal ordinance or an order of an administrative agency. Any governmental action is included and technical distinctions between 'law,' 'regulation,' 'order' and the like are disregarded. . . [t]he regulation or order must directly affect a party's performance in such a way that it is impracticable for him both to comply with the regulation or order and to perform."  <u>Id.</u> at § 264 cmt. b.  As discussed above, the parties in the instant dispute reached a compromise agreement pursuant to which the concert occurred. Furthermore, for the reasons discussed below, the Court finds that there are material issues of fact regarding ACPD's actions and thus summary judgment based on this section of the

10

Restatement is not warranted in favor of AC Pro Ball Club.

Furthermore, to the extent that AC Pro Ball Club relies on various New Jersey cases for the proposition that where the government intervenes in a contract between private parties, the parties cannot be held liable, the Court finds those cases inapposite because significant issues of fact remain as to the nature and character of the ACPD's action in the instant suit.  For example, in M.J. Paquet Inc., 171 N.J. 378 (2002),  the New Jersey Supreme Court considered the impact of revised regulations issued by the Occupational Safety and Health Administration on a public contract. Similarly, in Directions Inc. v. New Prince Concrete Construction Co., 200 N.J. Super 639 (App. Div. 1985), the Court considered the impact of an order issued by an authorized representative of the New Jersey Department of Transportation that was supplemented by a memorandum from the County Prosecutor's Office immediately prohibiting the use of civilian flagmen to direct traffic and requiring, instead, the use of police to direct traffic.  In these cases, the courts were faced with specific governmental actions – regulations or orders – that rendered the performance of a contract impracticable.  Unlike the government action at issue in M.J. Paquet Inc. and Directions Inc., in the instant matter, the Court is not faced with a specific government regulation or order.  Indeed, the record is replete with various communications between the ACPD and Defendants that highlight the ambiguous nature of the actions taken by both AC Pro Ball Club/AC Surf and the ACPD.  For example, after the concert was initially cancelled, Mario Perrucci sent a memo to Plaintiffs which read, "[p]lease be advised that after consultations with the Atlantic City Police Department. . . [the event] has been canceled.  The Atlantic City Surf received notice from the ACPD on Monday Aug. 19 that the concert could be a target for gang related violence."  Pls Br. in Opp. to AC Pro Ball Club's Mot. for SJ,

Braverman Cert., Ex. E.   Moreover, on August 20, 2002, the AC Pro Ball Club/AC Surf issued a press release stating that: "[t]he decision to cancel was a mutual one reached by the Atlantic City Surf and the Atlantic City Police Department."  Pls Br. in Opp. to AC Pro Ball Club's Mot. for SJ, Braverman Cert., Ex. I.

In addition, the deposition testimony of various parties involved in the instant matter is equally riddled with inconclusive statements about the nature of the ACPD's action.  For example, Jeffrey Rodman testified regarding the initial meeting with members of the ACPD on August 16, 2002, "[i]t was very quick. It was very simply they had concerns about the event that was going to take place.. . They had serious concerns about security of this event. So, they wanted me – they wanted from me as to whether I had security in place. . .They were concerned about gang violence."  Rodman Dep. 74.  Moreover, Rodman testified that he and Perrucci had talked about cancelling the event prior to the conference call with the city on August 19th and that the actual decision to cancel the concert happened after both the conference call with the city and a meeting with Plaintiffs.  Rodman Dep. 110:9-12.  Specifically, Rodman testified that "Mike and Akeem came in. I said. . . You guys need to get some assurance in to the City that you guys have this place secure because, you know, <u>there's a conversation going on right now about canceling this thing</u>. Before I got a chance to even get Mario. . .or anybody on the phone in the same communication with Mike and Akeem, Mike was. . .defending himself. . . Akeem stopped him and said no, I'm calling a lawyer and they left, they walked out. They said next time you hear from us, we're going to have a lawyer. So I didn't even get a chance to relate to them any of the details of that meeting nor did we get to have a conference regarding. . .any decision to be made. When they left the building, then it was a decision was made. . .we have to stop this concert. .

.take the appropriate steps." Id. at 115-116.

Perrucci's testimony is equally unclear as to the nature of the ACPD's action regarding the cancellation of the concert. For example, Perrucci testified that "[b]ased on the information they [ACPD] said they had, they were asking us or actually telling us not to have the concert in the interest of public safety." Perrucci Dep. 41:20-23. Perrucci also noted, "I asked the question, you want us to shut this down? And they said, that's right. I believed I had no choice. When somebody tells me that there is a chance that there will be violence inclusive of people getting hurt and/or killed and having a family atmosphere that we try to project, there I was going to not take the city on. I respect them. I believed what they said and they said don't have it, we do not want you to have this concert, so I followed their instructions." Id. at 76:17- 77:3.

Similarly, Michael Erskine, the Deputy Chief of the ACPD, testified that although he spoke to Perrucci on August 16th and "urged them not to have the concert", Erskine Dep., 62:20-21, the extent of these recommendations is unclear. For example, during his deposition, Erskine stated, "I know he [Perrucci] was thinking about it [cancelling the concert] because we urged him to, but no, I didn't get a feeling that – I hoped he would [cancel the concert], but I didn't think he would at that point. I really didn't know." Id. at 71:5-10. Moreover, Erskine testified that although the concert was cancelled on Monday, August 19, he waited until Tuesday, August 20, to write an internal memo to the police chief recommending the cancellation of the concert. When asked why he waited until after the concert was cancelled to write this memo, Erskine testified that he "was trying to provide something to the Surf to help them because they were getting a lot of heat from the media, why are you doing this?. . . and they were left hanging and I. . . I thought it wasn't fair for them to be left hanging. So I put a memo to the chief, which he

13

already knew what was going on, but I put it in writing to him and sent a copy to them to give

them some information.. . I thought that was the right thing to do because they weren't by

themselves.  They might have cancelled it, but we urged them to cancel it due to what we knew."

Erskine Dep. 73, 76 (emphasis added).   Indeed, Erskine's internal memo to the Police Chief –

not to AC Pro Ball Club, Perrucci, Rodman or Jersey Shore – provided, "[a]s Commander of the

Operations Division, I believe it is my responsibility to bring this information to your attention

and request cancellation of this concert for the public safety of the citizens of Atlantic City. . . I

believe that there is a strong possibility of violence before, during and after this event whereas I

cannot guarantee the safety of the public."  City Defs. Mot. for SJ, Riso Cert., Ex. F (emphasis

added).

        Based on the above record, the Court finds that there are significant issues of fact as to

whether the cancellation of the concert was due to a joint decision of the AC Pro Ball Club/AC

Surf and the ACPD or if the ACPD's actions could be perceived as a mandatory directive with

which Defendants were forced to comply.  In other words, there are issues of fact as to whether

the actions of the ACPD amounted to a mere recommendation or request to cancel the concert or

if the ACPD's actions could be perceived as a government order, regulation or directive.

        Finally, AC Pro Ball Club argues that summary judgment is appropriate because the

ACPD frustrated the principal purpose of the contract, thereby voiding the contract and

discharging the parties from their respective duties.  Section 265 of the Restatement of Contracts

provides, "[w]here, after a contract is made, a party's principal purpose is substantially frustrated

without his fault by the occurrence of an event the non-occurrence of which was a basic

assumption on which the contract was made, his remaining duties to render performance are

discharged, unless the language or the circumstances indicate the contrary." Restatement (Second) of Contracts § 265. The accompanying comments elaborate three requirements necessary to invoke the defense of frustration of purpose. Id. at cmt. a. First, the frustrated purpose must have been a principal purpose of that party in making the contract. Second, the frustration must be so substantial "that it is not fairly to be regarded as within the risks that [the parties] assumed under the contract." Id. Finally, the commentary reiterates that the doctrine may not be invoked where the parties assumed the risk of the occurrence of the frustrating event. Id.; see also Unihealth v. U.S. Healthcare, Inc., 14 F. Supp. 2d 623, 634-635 (D.N.J. 1998). Accordingly, AC Pro Ball Club argues that (1) the principal purpose of the contract was for the performance of a concert at Sandcastle Stadium; (2) the purpose was frustrated by the threat of gang violence and the demands of the ACPD; and finally, (3) that neither party to the contract assumed the risk of gang related violence or defying the City of Atlantic City. The Court does not agree.

To begin, as noted throughout this opinion, the concert at issue in this suit actually occurred at the time and place in the contract. Thus, the Court finds that a defense of frustration of purpose is inapplicable in the instant matter. However, it is important to note that even if this defense were appropriate here, the defendant has not established the elements necessary to sustain a defense of frustration of purpose. Specifically, although the Court agrees that the first element is met because the principal purpose of the contract was for the performance of a concert, defendants have not established the second and third elements in the contract. For example, under the second prong of the test, although Defendant argues that the purpose of the contract was frustrated by the demands of the ACPD, as noted above, substantial issues of fact

15

remain as to the nature and character of the decision to cancel the concert and, specifically, the ACPD's role in facilitating that decision. Moreover, the Court has substantial questions about the third prong of the test.  Specifically, the contract between Platinum Links and AC Pro Ball Club/AC Surf provided that Platinum Links was responsible for the security of the event including paying for and providing security by a "team approved concert security company."  In addition, the contract provided that "[f]acility security shall be agreed upon (by AC Surf, Your organization [Platinum Links] & police) number of off duty AC Police Officers & shall include officers conducting traffic control on Albany Ave."   Moreover, Platinum Links was responsible for the acquisition of any necessary permits prior to the staging of the concert.  Thus, significant issues of fact exist as to whether Platinum Links, in fact, assumed the risk of not providing appropriate security or getting the ACPD to agree to its security plan.  For all these reasons, the Court denies Defendant AC Pro Ball Club's Motion for Summary Judgment without prejudice.

**2. City Defendants Motion for Summary Judgment**

The Amended Complaint sets forth five counts against the City Defendants including both constitutional and state law claims.  Specifically, the Complaint alleges that the City Defendants violated Plaintiffs' due process, equal protection and first amendment rights pursuant to 42 U.S.C. § 1983.  In addition, Plaintiffs allege that Defendants violated their rights pursuant to 42 § U.S.C. § 1981 and Plaintiffs also allege a state law claim for tortious interference with contract.  City Defendants move for summary judgment on each count.

Prior to addressing the individual counts, however, the Court must initially consider whether the claims against the individual defendants, Fitzgerald, Erskine and Snellbaker, are

barred by the doctrine of qualified immunity.  Plaintiffs have highlighted the actions of these individual defendants that are relevant in the instant matter.  For example, Benjamin Fitzgerald's relevant actions are his participation in the August 19, 2002 conference call and at the hearing before Judge Irenas.  See Fitzgerald Dep. 8:14-31, 20:21-23.  Plaintiffs identify Deputy Chief Erskine's actions as his participation in the meeting with AC Pro Ball Club/AC Surf on August 16, 2002, Erskine Dep. 60-61, and the August 20th internal Memo he prepared for Chief Snellbaker requesting the cancellation of the concert.  City Defs. Mot. for SJ, Riso Cert., Ex. F. Finally, Plaintiffs identify Chief Snellbaker's involvement as his "consent to the actions taken by ACPD personnel under his command" including his failure "to inquire as to the validity of Erskine's concerns regarding gang-related violence and consenting to Erskine's drastic recommendation that the event be shut down."  Pl's Opp. to City Defendants Mot. for SJ at 14.

Qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Sharrar v. Felsing, 128 F.3d 810, 826 (3d Cir.1997); Orsatti v. New Jersey State Police, 71 F.3d 480, 483 (3d Cir.1995). "Government officials, such as police officers, are accorded qualified rather than absolute immunity in order to accommodate two important interests: the officials' interest in performing their duties without the fear of constantly defending themselves against insubstantial claims for damages, and the public's interest in recovering damages when government officials unreasonably invade or violate individual rights under the Constitution and laws of the United States." Orsatti, 71 F.3d at 483 (citing Anderson v. Creighton, 483 U.S. 635, 639 (1987)). The focus of qualified immunity is the "objective legal

17

reasonableness" of the actions taken by the public official.  Pro v. Donatucci, 81 F.3d 1283, 1286

(citing Anderson, 483 U.S. at 639).  The qualified immunity inquiry is a two step process.  First,

a court must decide "whether a constitutional right would have been violated on the facts alleged.

. ." Saucier v. Katz, 533 U.S. 194, 200 (2001). Second, if a Court finds that a constitutional

violation did occur, it must consider whether the right was "clearly established." Id. at 201; see

Groh v. Ramirez, 540 U.S. 551 (2004).

Turning to the first prong of the qualified immunity test, the Court must initially consider

whether the facts, taken in the light most favorable to the plaintiff, demonstrate a constitutional

violation. Saucier, 533 U.S. at 201; see also Couden v. Duffy, 2006 WL 1133312 at *3 (3d Cir.

May 1, 2006); Curley v. Klem, 298 F.3d 271, 277 (3d Cir.2002).  In the instant matter, Plaintiffs

allege that the individual defendants violated their First Amendment rights through the various

actions they took which culminated in the cancellation of the concert.   Plaintiffs concede that

they are not asserting the constitutional rights of the musicians and are instead asserting their

own rights to expressive conduct in promoting the concert. Pl's Br. in Opp. to City Defs. Mot. for

SJ at 25-26 ("Contrary to defendants [sic] characterization, the "expression" stifled was not that

of the performers but that of the plaintiffs themselves in planning for, promoting and reaping the

benefits of the concert.")  Indeed, it is well-established that concert and theatrical promoters

enjoy the protections of the First Amendment despite the commercial and for-profit nature of

their actions.  Southeastern Promotions Ltd. v. Conrad, 420 U.S. 546 (1975); Cinevision Corp v.

City of Burbank, 745 F.2d 560, 568 (9th Cir. 1984); LCN Enterprises Inc. v. City of Asbury Park,

197 F.Supp. 2d 141, 151 (D.N.J. 2002)(holding that promotion of an event constitutes expressive

activity and commercial speech protected by the First Amendment).  In Cinevision, for example,

18

the Court noted that in order "[t]o have access to live musical expression, the public must necessarily rely on concert promoters to make arrangements for musicians to perform.  The role of the promoter in ensuring access to the public is at least as critical as the role of the bookseller or theater owner. . . Thus, a concert promoter. . . is a type of 'clearinghouse' for expression." 745 F.2d at 568.  Therefore, these promoters can properly assert claims for violations of their own First Amendment rights.

The substance of Plaintiffs' First Amendment claim is that Defendants' request to cancel the concert was a content-based restriction that amounted to a prior restraint.  In the alternative, Plaintiffs argue that even if Defendants' actions did not rise to the level of a prior restraint, their actions created otherwise unreasonable time, place and manner restrictions.   Thus, the Court must first determine whether the Defendants' actions were precipitated by a disagreement with the expression itself and therefore amounted to a content-based restriction, or if Defendants' actions were content neutral, i.e. Defendants' actions regulated unprotected conduct and only indirectly affected Plaintiffs' protected expression.

The principal inquiry in determining content neutrality in speech cases generally, and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).  The government's purpose is the controlling consideration.  Id.  A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. See Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47-48 (1986). Government regulation of expressive activity is content neutral so long as it is "justified without reference to the content of the regulated speech."

Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984).

In the instant matter, Plaintiffs contend that the individual defendant's actions –

including Erskine and Fitzgerald's participation in the conference call and Erskine's memo –

arose out of a disagreement with the message of the concert.  Indeed, Plaintiffs point to the

following testimony from Erskine's deposition as support for this assertion:

> Q: The first time you heard about it, what did you hear about it?
> A: That there was a gangster rap group coming into Atlantic City and that the group's
> reputation was that of violence and violence preceding or gathering around any event that
> they were at. . .
> Q: When you say "gangsta rap," what is your understanding of what gangster rap is?
> A: I make an assumption. I am not a gangster rap fan or a rap fan. I don't listen to it. That
> gangster rap was the tag given to me by Ray Davis and Lonell Jones. It's a rap group. I
> make an assumption. I don't know but it sounds like they are gangsters, but I don't know.

Erskine Dep. 14:11-15:5.

Viewed in the light most favorable to Plaintiffs, Erskine's testimony reveals that his

justification for investigating and requesting a cancellation of the concert may not have been

entirely content-neutral.  Indeed, Erskine testified that he made "assumptions" based on his

understanding of the content of gangster rap.  Moreover, as discussed infra, on the record

established before me, it is unclear whether the police officer's initial decision to investigate the

concert occurred in the normal course of events or if there was something unusual about this

event that prompted the police to conduct an investigation in this matter.  Therefore, the Court

finds that the individual defendant's actions in recommending or directing Perrucci and Rodman

to cancel the concert, taken in the light most favorable to Plaintiffs, may be viewed as a content-

based restriction. Thus, Plaintiffs have satisfied the first prong of the test.

However, even if Plaintiffs satisfy the first prong of the qualified immunity test and demonstrate a violation of constitutional rights, the Plaintiffs must also meet the second prong of the test, a consideration of whether the right was "clearly established." Id. at 201; see Groh v. Ramirez, 540 U.S. 551 (2004).  As a general matter, a right is "clearly established" when the contours of the right are "sufficiently clear that a reasonable official would understand that what he is doing violates that right," and the question for the Court is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202.   For example, even where a Constitutional right has been violated, a police officer will be entitled to immunity where he or she reasonably believed that his or her conduct was lawful.  See Orsatti, 71 F.3d at 483.  This is an objective inquiry, to be decided by the court as a matter of law.  Bartholomew v. Pennsylvania, 221 F.3d 425, 428 (3d Cir.2000). Only if facts material to the issue of whether the official's acts were objectively reasonable are in dispute will there be an issue for the jury. See Sharrar, 128 F.3d at 828.  In other words, in order to find that the individual defendants are not entitled to qualified immunity, this Court must find that Fitzgerald and Erskine acted unreasonably in advising or recommending that the AC Pro Ball Club/AC Surf cancel the concert, that Snellbaker acted unreasonably by consenting to the actions of the ACPD personnel, and that the individual defendants did not reasonably believe that their conduct was lawful.  In light of the facts presented in the instant matter, the Court finds the individual defendants are entitled to qualified immunity.

Initially, the Court notes that one of the focuses of city government, and one of the main purposes,  if not the sole purpose, of a city police department is to maintain a vigilant regard for public safety.  In the instant matter, the individual Defendants, acting on behalf of the Atlantic

21

City Police Department, made recommendations to AC Pro Ball Club/ AC Surf allegedly based

on information they had received from several detectives about potential violence at an upcoming

rap concert.  City Defs. Mot. for SJ, Riso Cert, Ex. D & E.  For example, after the officers heard

about the concert at a weekly intelligence briefing, several detectives began to investigate links

between several of the performers and alleged violence.  In an August 8, 2002 memo, Detective

Lonell Jones wrote, "We have confirmed that N.O.R.E. and Styles P are affiliated with the

Bloods out of New York."  Riso Cert., Ex. D.  Similarly, a memo dated August 19, 2002 by

Detective Ron Davis provided:

> I spoke with a contact at the Camden County Prosecutor's Office
> who informed me. . .[that] [i]n August of 2000 Capone & Noreaga.
> . .held a concert in Pennsauken, NJ where 11 people were either
> shot or stabbed, one person was killed and Nore and his crew are
> suspects in the shootings, stabbings and homicide. . . Capone &
> Noreaga were also involved in a shooting with a rival rap group
> that occurred in front of Radio Station Hot 97 in New York. . .
> According to Contacts at NYPD Nore and members of his crew are
> Blood members or affiliates of the Bloods.

Riso Cert., Ex. E.

Moreover, Deputy Chief Erskine testified that his decision to request cancellation of the

concert was rooted in a concern for public safety.  In response to a question about how he came

to the conclusion that the ACPD could not guarantee the safety of the public, Erskine testified

that he based his conclusion on information he received from intelligence officers including

"various venues that they have checked. They checked with various police officers at the various

sites that this Noreaga group or whoever had recently had concerts at; what problems, if there

were any problems, at the venue site itself. .. The historical basis of what had occurred in the very

22

recent past in these events before, during and after.. . I thought the violence was a very heavy possibility based on intelligence." Erskine Dep. 38:10- 41:15.   Further, before making any recommendation about the concert, individual ACPD officers contacted AC Pro Ball Club/ Atlantic Surf to determine who was responsible for creating and implementing a security plan for the concert.  See Erskine Dep. 37:7-11; Rodman Dep. 74, 76-78.  Moreover, Rodman admits that he told these police officers that Plaintiffs had not provided a security plan as of Friday the 16th. Rodman Dep. 76:22- 78:7.   Based on the officers' investigation and, especially,  in light of the absence of a security plan just nine days before the concert,  the Court cannot find that the individual defendants acted unreasonably in requesting the cancellation of the concert out of a concern for public safety.  Thus, the Court holds that the individual defendants are entitled to qualified immunity.  However, the Court must still consider Plaintiffs' claims against Atlantic City.

## A. 1983 Claims Against Atlantic City

Section 1983 provides a cause of action for any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected" any person to the deprivation of any right protected by federal law or the United States Constitution.  Section 1983 does not create substantive rights, but "merely provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws."  Estate of Smith v. Marasco, 318 F.3d 497, 505 (3d Cir. 2003) (citing Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996)).

Governmental entities such as a municipality may be  "liable for any constitutional

deprivations. . . only if 'there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" Brown v. Muhlenberg Township, 269 F.3d 205, 214 (3d Cir.2001) (quoting City of Canton v. Harris, 489 U.S. 378, 385 (1989)). Courts demand some degree of culpability flowing from the government entity, because liability under § 1983 may not be imposed on a theory of respondeat superior.  Monell v. Dept. of Social Services, 436 U.S. 658, 691-695(1978).  Thus, governmental entity liability may be alleged in one of two ways. The entity may be liable "if it is alleged to have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.' " City of St. Louis v. Praprotnik, 485 U.S. 112, 121 (1988) (quoting Monell, 436 U.S. at 690).  Alternatively, liability may also be alleged if there is a "causal link between the constitutional deprivation and a custom, 'even though such a custom has not received formal approval through the body's official decision making channels.' " Brown, 269 F.3d at 215 (quoting Monell, 436 U.S. at 690-91).

In the instant matter, Plaintiffs argue that Atlantic City is liable under a policymaker theory.  Specifically, Plaintiffs contend that the city developed and promulgated an official policy cancelling the concert through the actions of official policymakers, i.e. that the individual defendants in this case violated Plaintiffs' First, Fourth and Fourteenth Amendment Rights.  In support of these assertions, Plaintiffs rely on the depositions of Chief Snellbaker and Deputy Chief Erskine and on several documents authored by various city employees. The City, on the other hand, argues that the record does not establish the existence of a policy to cancel the concert and violate Plaintiffs' Constitutional Rights.  Instead, the City argues that individual employees simply made recommendations regarding the concert based on specific information

about this individual concert and the artists who were to perform and that these recommendations did not rise to the level of an official policy.  However, the Court finds on the record presented here, there are significant issues of material fact that preclude the City's Motion for Summary Judgment.

In St. Louis v. Praprotnik, 485 U.S. 112 (1988), the Supreme Court reviewed the principles that govern when a decision on a single occasion may establish an unconstitutional municipal policy and which city officials may be held liable for it.  In Praprotnik, the Court held that § 1983 liability exists only for acts "which the municipality has officially sanctioned or ordered."  Id. 485 U.S. at 123.  Moreover, the Court held that "only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability."  Praprotnik, 485 U.S. at 123.   In other words, "an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business."  Id.  Further, Praprotnik established that "simply going along with discretionary decisions" is not sufficient for liability, id. at 130, and that  a determination of whether a particular official has "final policymaking authority" is a question of state law.  Id. at 123.  Thus, for liability to lie, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business.  Id.  Therefore, to determine whether Atlantic City is liable in the instant matter, this Court  must determine whether the city sanctioned the policy cancelling the concert, i.e. whether any of the individual defendants has final policymaking power, whether any of those same defendants promulgated this official policy and whether the concert was cancelled pursuant to this policy.

To begin, Plaintiffs allege that the individual defendants are policymakers for Atlantic City.  In support of this assertion, Plaintiffs point to seven lines of testimony from Snellbaker's deposition; specifically, Plaintiffs rely on the following testimony: "I'm the chief executive officer of the Police Department. Overall responsibility for the budget, day-to-day operations of the deployment of the manpower, and the performance of police services for the City of Atlantic City."  Snellbaker Dep.15:13-20.  Although Snellbaker's testimony is primarily a description of his job, the Court notes that it is consistent with the duties of a policy maker, and that it is not unusual for a police chief to retain policymaking power for the city police department.  Moreover, neither Plaintiffs nor Defendants have pointed to a state or local law, ordinance or regulation describing the policymaking authority of the Atlantic City Police Chief.  Thus, the Court finds that issues of fact exist as to whether Snellbaker may be considered a policymaker.

Unlike Snellbaker, however, Plaintiffs have not established issues of material fact regarding the policymaking power of Erskine and Fitzgerald.  To begin, the Court notes that Plaintiffs have not argued or put forth any evidence regarding Fitzgerald's alleged policymaking authority.  Thus, there is no issue of fact that Fitzgerald does not have policymaking authority.  Moreover, the only evidence Plaintiffs rely on to establish that Deputy Chief Erskine had policymaking power is as follows:

> Q: How long have you been with the Atlantic City Police Department?
> A: I am in my 34 year. July 1st, 1971.
> Q: What is your current title?
> A: Deputy chief.

Erskine Dep. 7:8-13.

Therefore, unlike Snellbaker's testimony, Erskine's testimony merely establishes his title and the length of his employment; this testimony does not define Erskine's responsibilities nor does it establish whether he had policymaking power for Atlantic City.  Further, as discussed in reference to Snellbaker's authority, neither Platinum Links nor the City Defendants have pointed to any law or regulation that describes whether the Deputy Chief of the Atlantic City Police maintains policymaking power.  Because this is a motion for summary judgment, Plaintiffs must establish that there are issues of material fact regarding Fitzgerald's and Erskine's policy making function in order to prevail.  Plaintiffs have failed to do so.  Thus, on the record before me, while I find significant questions of fact as to whether Snellbaker may be considered a policymaker for Atlantic City, Plaintiffs have not established issues of fact as to the policymaking responsibilities of Fitzgerald or Erskine.

Moreover, the Court finds that there are material issues of fact as to whether the Defendants' decision to request cancellation of the concert amounted to an official policy or something less than a policy.  "Policy is made when a decision maker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy or edict."  Robinson v. City of Pittsburgh, 120 F.3d 1286, 1296 (3d Cir. 1997).  To begin, in the instant matter, the record is devoid of any evidence establishing the ACPD's normal course of investigation when it learns of an upcoming performance in Atlantic City.  Here, when the ACPD initially heard about the upcoming concert, it immediately starting investigating the potential for violence at such an event.  Erskine Dep. 13-15.  However, the record does not suggest whether these investigations are part and parcel of normal police procedure or whether this investigation deviated from the norm and the police were investigating these performers for an usual and

particular purpose.  For these reasons, the Court is left with questions as to whether the ACPD's decision to investigate may have amounted to some kind of policy or if the investigation was in line with the normal course of events.

Furthermore,  Plaintiffs point to three documents to establish that the city's recommendation to cancel the concert amounted to an official municipal policy: (1) an intelligence report from Detective Lonell Jones to Seargent Joseph Friedrich that provides, in relevant part, "[w]e have confirmed that N.O.R.E. and Styles P are affiliated with the Bloods out of New York. The event is being presented by Platinum Links Entertainment", Pls Opp. to City Defendants' Mot. for SJ, Braverman Cert, Ex. I; (2) a memo from Detective Davis to Captain Dooley that provides background information about the concert, <u>Id.</u>, Ex. J.; and (3) an internal memo from Deputy Chief Erskine to Chief Snellbaker dated August 20, 2002 that provides, "[a]s Commander of the Operations Division, I believe it is my responsibility to bring this information to your attention and <u>request cancellation</u> of this concert for the public safety of the citizens of Atlantic City." <u>Id.</u>, Ex. K (emphasis added).  To begin, the Court notes that the first two "memos" arose out of the city's investigation. Although the memos provide background information about the concert, the Court questions whether these types of documents are commissioned in the normal course of events or if these memos point to the existence of some kind of policy to investigate these performers in particular.  Moreover, unlike the first two documents which provide general information, the third memo "request[s] cancellation" of the concert.  Importantly, the Court notes that the memo was dated August 20, 2002, a day after the Plaintiffs were told that the concert was, in fact, cancelled. Thus, there is some question as to whether this memo could amount to a policy since it was written post-cancellation.  However,

Erskine's testimony suggests that his memo was an after-the-fact memorialization of an already existing policy and not the initial intimation of a policy. Indeed, the Court notes that Erskine testified as follows:

> Q: Why did you wait until the 20th to write the memo?
>
> A: Because on the 19th the cancel – I received information that the concert was cancelled on the 19th and I was trying to provide something to the Surf to help them because they were getting a lot of heat from the media. . . I thought it wasn't fair for them to be left hanging.  So I put a memo to the chief, which he already knew what was going on, but I put it in writing to him and sent a copy to them to give them some information
> . . . . . .
> Q: Why did you prepare the memo? Did you just prepare the memo on the 20th because you felt bad for the Surf?
>
> A: I received a phone call from Deputy Chief Glass. . . He stated to me that the Surf was getting hit with a lot of media attention and that they were out there on the limb by themselves and can we do anything; can you give them some information as to why it was cancelled and you know what? I did. I thought that was the right thing to do because they weren't by themselves.  They might have cancelled it, but we urged them to cancel it due to what we knew.

Erskine Dep., 72:24-76:5 (emphasis added).

Thus, despite Defendants' allegation that there was no official policy to cancel the concert, the record establishes material issues of fact as to whether Atlantic City's actions amounted to an official policy or something less than a policy.  Therefore, I must deny Defendants' Motion for Summary Judgment on Plaintiff's §1983 Claims.

## B. 1981 Claims Against Atlantic City

The Fourth Count of Plaintiffs' Complaint alleges violations of Plaintiffs' rights pursuant to 42 U.S.C. §1981.  Section 1981, which prohibits racial discrimination in the making and

enforcement of contracts,  provides in pertinent part, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State or Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other."  42 U.S.C. §1981.  In order to state a claim under § 1981, plaintiffs must establish the following: (1) that they are a member of a racial minority; (2) intent to discriminate on the basis of race by the defendants; and (3) discrimination concerning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts. . . " Brown v. Phillip Morris, Inc., 250 F.3d 789, 797 (3d Cir. 2001).   A showing of disparate impact is insufficient because § 1981 only provides a cause of action for intentional discrimination. Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 562 (3d Cir.2002).

In the instant matter, Plaintiffs contend that they have met all three elements necessary to establish a violation of § 1981 because: (1) Plaintiffs are African American; (2) Defendants intentionally discriminated against Plaintiffs on the basis of their race when they recommended cancelling the concert; and (3) that the discrimination in question concerned the right to make and enforce contracts. Defendants, on the other hand, argue that there is nothing in the record to suggest that the City Defendants engaged in racially motivated discrimination.  Instead, Defendants contend that the record is replete with unsupported assertions and conclusory allegations which are insufficient to defeat a motion for summary judgment.  Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).  The Court agrees.

To begin, the Court notes that although Plaintiffs have met the first prong of the test,

Plaintiffs have not come close to establishing a genuine issue of material fact on the second prong. To support their claim that City Defendants' actions were based on racial animus and not a genuine fear of imminent violence, Plaintiffs cite to Deputy Chief Erskine's August 20, 2002 memo[5]. However, the Court finds this evidence unconvincing; Erskine's memo makes no mention of race, and instead, discusses various instances of violence associated with the Bloods as gleaned from police intelligence reports. Similarly, the testimony on which Plaintiffs rely in support of their assertion that City Defendants intentionally discriminated against them do not, in fact, make any mention of race or racial animus. Instead, this testimony discusses specific threats related to gangs and gang violence.

Further, aside from the lack of evidence of racial animus, this Court is troubled by Plaintiffs' unsupported assertion that City Defendants used the word "gang" as a way to disguise their racial animus. In their brief, Plaintiffs contend: "Defendants' actions were based solely on their fears of the type of concert being presented, i.e. a rap concert, and what they perceived to be the potential for gang-related violence. There is no question that in the current vernacular or lexicon of our society, this means race. Plaintiffs submit that the words "gangsta rap" and "gang-related violence" are closely identified with particular minorities. . .The documentary and deposition testimony is absolutely rife with defendants descriptions of the threat of 'gangs', 'gangsta rap' and 'gang-related violence' as the primary motivation behind its decision to shut down the concert. These tags are mere code which was adopted by defendants in an effort to

---

[5]Because Plaintiffs cite to this memo in full, the Court is unclear which part of the memo appears discriminatory to Plaintiffs. However, in light of Plaintiffs' argument, the Court will assume that the following is what Plaintiffs believe is most relevant: "[t]his Gangsta Rap group has an established history of violence and gang affiliation with the Bloods." Pls. Opp. to City Defs. SJ Mot., Braverman Cert., Ex. K.

conceal there [sic] true motivation, racial animus. "  Pl's Br. in Opp. to City Defendants Mot. for SJ at 20 (emphasis added).

Despite Plaintiffs' assertions, the Court finds that this allegation is nothing more than conjecture unsupported by the record.  There is nothing before the Court to suggest the conflation of "gangsta rap" with racial animus.   Moreover, Plaintiffs' assertions ignore the overwhelming use of words such as "gangsta rap" to describe a popular type of music that is performed by and enjoyed by people of diverse races.[6]  Viewing the evidence in the light most favorable to Plaintiffs, and drawing all inferences in their favor, I find no facts and can draw no inferences to support a finding that any of the Defendants acted with racial animus or intended to discriminate against Plaintiffs on the basis of race.  The record is devoid of any evidence in this regard.  For these reasons, the Court holds that Plaintiffs have not established a genuine issue of material fact with regard to their assertion that the municipal Defendants acted with racial animus.  Thus, Plaintiffs cannot withstand these Defendants' motion for Summary Judgment on their §1981 claim.

---

[6] Although this Court does not necessarily consider Wikipedia an authoritative source, Plaintiffs rely on a definition of the term "rap music" from this website in support of their argument.  See Pl's Br. in Opp. to City Defendant's Mot. for SJ at p. 15 n. 22.  Plaintiff's citation led this Court to look up, sua sponte, the term "gangsta rap" on the same website, and this Court notes that the description does not make mention of race. "Gangsta rap is a subgenre of hip hop music which involves a lyrical focus on the lifestyles of inner-city criminals. Although crime and violence in the inner city have always been part of hip hop's lyrical canon, before the rise of gangsta rap the subject was not embraced or addressed so blatantly. Gangsta rap also signaled an end to the mainstream popularity of socially conscious lyrics put forward by golden age artists. Gangsta rap was pioneered by Ice-T, who was influenced by Schooly D's Hardcore rap but still mixed in a lot of social commentary in his lyrics. Crews such as N.W.A would go on to set the stage for gangster rap to be the norm."  See http://en.wikipedia.org/wiki/Gangsta_rap (last visited April 27, 2006).

**C. Tortious Interference with Contract**

The Sixth Count of Plaintiff's Complaint alleges that Atlantic City's recommendation to cancel the concert amounted to a tortious interference with the contractual relationship between Plaintiffs and the Atlantic City Surf.   Defendants, on the other hand, contend that cities are afforded immunity for discretionary activities pursuant to the New Jersey Tort Claims Act.  N.J. Stat. Ann. § 59:2-3.  Moreover, Defendants argue that even if they are not immune, Plaintiffs cannot establish a viable claim for tortious interference with contract.

To begin, it is well-settled that public entities are afforded immunity for discretionary activities. Pursuant to the New Jersey Tort Claims Act, "(a) a public entity is not liable for an injury resulting from the exercise of judgment or discretion vested in the entity; (b) a public entity is not liable for legislative or judicial action or inaction or administrative action or inaction of a legislative or judicial nature." N. J. Stat. Ann. 59:2-3.  Determining whether governmental action is discretionary for the purposes of the Tort Claims Act generally depends upon whether the decision is a high level policy decision.  Costa v. Josey, 83 N.J. 49 (1980).  The exercise of discretion  in N.J.S.A. 59:2-3(a) refers to actual, high-level policymaking decisions involving the balancing of competing considerations.  Coyne v. Department of Transportation, 182 N.J. 481, 489-490 (2005).  Such decisions have been traditionally entrusted to coordinate branches of government, and courts, utilizing standard tort principles, are ill-equipped to interfere with them. Id.  Generally "high level policy decisions classified as discretionary acts involve planning, and are distinct from ministerial acts, which pertain merely to operations and which are not immunized." Dix Bros. v. State, 182 N.J.Super. 268, 271 (Law Div.1981).  "[I]mmunity for

33

public entities is the rule and liability is the exception." <u>Fluehr v. City of Cape May</u>, 159 N.J. 532, 539(1999).  In the instant matter, the Court finds that the record is not sufficiently developed to determine whether Atlantic City's actions were discretionary or ministerial.

However, even if Plaintiff could establish that Defendants were not immune pursuant to N.J. Stat. Ann. § 59:2-3, Plaintiff would then have to establish the elements of a claim for tortious interference with contract.  These elements include: (1) a protected interest; (2) malice, i.e. defendant's intentional interference without justification; (3) a reasonable likelihood that the interference caused the loss of the prospective gain; and (4) resulting damages.  <u>MacDougall v. Weichert</u>, 144 N.J. 380, 404.  In this case, the critical inquiry is whether Defendant's interference was "without justification or excuse," and thus malicious.  <u>See</u> <u>Printing Mart-Morristown v. Sharp Elecs. Corp.</u>, 116 N.J. 739, 756(1989); <u>see also</u> <u>MacDougall</u>, 144 N.J. at 404.  That inquiry must focus on the propriety of the defendant's actions in the context of the case presented.  <u>Printing Mart-Morristown,</u> 116 N.J. at 757.  Plaintiffs bear the burden of proving the absence of justification.  <u>Id.</u>  This, the Court finds, Plaintiffs cannot do.

In the instant case, the City Defendants were faced with information suggesting a strong possibility that violence would occur at Plaintiffs' concert.  Moreover, as discussed above, although the concert was only one week away,  Plaintiffs had not yet drafted or implemented a security plan for the concert as required by their contract with the Atlantic City Surf.  In light of these facts, Plaintiffs cannot establish that the City Defendants acted without justification.  In addition, the Court notes that after a conference in front of Judge Irenas, the parties came to a compromise agreement enabling the concert to go forward pending the inclusion of certain security measures.  This suggests to the Court that security concerns were the justification for

City Defendants actions, and thus, Plaintiffs cannot establish that City Defendants acted with malice, i.e. intentionally and without justification.   Finally, at this late juncture, more than three years after filing their Complaint, Plaintiffs have not met their burden to put forth any facts proving the absence of justification.   For these reasons, this Court grants the City Defendants' Motion for Summary Judgment on the claim of tortious interference with contract.

### 3. Mario Perrucci's Motion for Summary Judgment against AC Pro Ball Club

On November 15, 2005, Third Party Defendant Mario Perrucci ("Perrucci") moved for Summary Judgment on the Third Party Complaint of AC Pro Ball Club. The Motion is unopposed.  Perrucci alleges that there is no issue of material fact regarding any action he took because his actions were a direct result of directives issued by the Atlantic City Police Department, and thus, Perrucci contends that he should not be held liable for any damages.  In his brief, Mr. Perrucci contends that the City of Atlantic City "ordered" that the concert be cancelled, and thus he should not be held liable for following orders.  See Perrucci Br. at 12.  In support of this argument, Mr. Perrucci cites numerous New Jersey cases which hold that a citizen's failure to comply with reasonable police directives constitutes a disorderly persons offense.  See, e.g., New Jersey v. Brennan, 344 N.J. Super. 136, 143 (App. Div. 2001). To begin, the Court finds that those cases are not analogous to the situation in the instant matter.  For example, in Brennan, Defendant was arrested for defiant trespass for refusing to cede to a police order to leave a town meeting.  Unlike Brennan, where there was a specific directive ordered at the Plaintiff, in the instant matter there are significant issues of fact as to the nature and scope of Atlantic City's

action[7].   Thus, Perrucci's argument that his actions were the result of the ACPD's directive is

unavailing and the Court will not grant his motion for Summary Judgment on that basis.

     Additionally, Perrucci argues that this Court should determine that he bears no individual

liability for any actions taken on behalf of Jersey Shore Baseball, the limited liability company in

which he was a principal.  In other words, Perrucci argues that this Court should not pierce the

corporate structure of Jersey Shore Baseball to find him personally liable.  To the extent that the

Third Count of AC Pro Ball Club's Third Party Complaint can be read to suggest that this Court

pierce the corporate structure of Jersey Shore Baseball, the Court agrees[8].

     To begin, the Court notes that AC Pro Ball Club has not responded to Perrucci's Motion.

Thus, there is no issue of fact in dispute. See U.S. v. Rohm & Haas Co., 939 F.Supp. 1157, 1161

(granting summary judgment on basis that plaintiff's argument was unopposed, and thus no

genuine issue of material fact was created).  Moreover,  "[g]enerally corporate shareholders or

officers may be held personally liable for the corporation's violations of the law where the officer

has participated in the wrongful acts of the corporation or where the court finds that it is

appropriate to pierce the corporate veil." NJ Dept. Of Environmental Protection v. Gloucester

Environmental Management Services, Inc.,  800 F. Supp. 1210, 1219 n. 9 (D.N.J. 1992).  The

effect of piercing a corporate veil is to hold the owner of the corporation liable and the rationale

---

    [7]Consistent with this Court's earlier findings and despite the fact that AC Pro Ball Club
has not opposed Perrucci's motion, there are significant issues of fact as to the nature and scope
of ACPD's involvement in this matter.

    [8]Importantly, the Court notes that AC Pro Ball Club's Third Party Complaint sets forth
three Counts against Perrucci and Jersey Shore Baseball, and only the Third Count is implicated
by Perrucci's Motion.  Thus, Perrucci may still be found liable for indemnification under First
Count and Perrucci's corporation, Jersey Shore Baseball, may be found liable under the Second
Count.

for piercing the corporate veil is that the corporation is something less than a bona fide independent entity.  Id. at 1219; see also Donsco, Inc. v. Casper Corp., 587 F.2d 602, 606 (3d Cir.1978).   In Gloucester Environmental, the court noted that in order to pierce the corporate veil, evidence must be presented to show that the corporation is a "sham" which existed to avoid personal liability of the officers.  Id.    In the instant matter, no evidence has been presented to this Court on the issue of piercing.  Specifically, aside from Count Three of AC Pro Ball Club's Third Party Complaint which seeks to recover from Defendants Mario Perrucci, Jeffrey Rodman and Jersey Shore Professional Baseball, LLC "jointly, severally and/or in the alternative", AC Pro Ball Club has not set forth any facts or legal argument on the issue of piercing the corporate veil.  Moreover, Third Party Plaintiffs never assert that piercing is or may be appropriate and they never responded to Perrucci's Motion for Summary Judgment.  Indeed, Perrucci himself raised the issue of piercing in his motion for summary judgment which was unopposed by AC Pro Ball Club.  Thus, AC Pro Ball Club has not satisfied its burden to establish a factual issue of whether or not this Court should pierce the corporate veil, and I will grant Perrucci's Motion for Summary Judgment to the extent that the Third Count of AC Pro Ball Club's Third Party Complaint can be read to include such an allegation.

**IV. Conclusion**

For the reasons discussed herein, AC Pro Ball Club's Motion for Summary Judgment is DENIED without prejudice.  Moreover, the Motion for Summary Judgment on the issue of Qualified Immunity by Erskine, Snellbaker and Fitzgerald -- the individual City Defendants– is

GRANTED, and the City Defendants' Motion for Summary Judgment on Plaintiffs' §1981 Claim and Plaintiffs' Claim for Tortious Interference with Contract is GRANTED.  However, the City Defendants' Motion for Summary Judgment on Plaintiffs' §1983 Claims is DENIED.

Finally, to the extent that the Third Count of AC Pro Ball Club's Complaint can be read to include a claim piercing the corporate veil, Perrucci's Motion for Summary Judgment is GRANTED; however, Perrucci's Motion for Summary Judgment is DENIED in all other respects.   An appropriate order will follow.

Dated: May 23, 2006                                    _____/s/ Freda L. Wolfson_____
                                                       Honorable Freda L. Wolfson
                                                       United States District Judge

38